**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**CLIFFORD MERRITT,**

        **Petitioner,**

**v.**                           **Civil Action No. 2:10CV47**
                                    **(Judge Bailey)**

**WARDEN ADRIAN HOKE,**

        **Respondent.**

## OPINION/REPORT AND RECOMMENDATION

This case was initiated on April 9, 2010, by the filing of a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody. (Doc. 1). On May 12, 2010, Petitioner paid the $5.00 filing fee. (Doc. 11). On May 20, 2010, the Respondent was ordered to show cause why the petition should not be granted. (Doc. 12). On June 14, 2010, the Respondent filed his Response together with a Motion for Summary Judgment and a Memorandum in Support. (Docs. 14-16). Because Petitioner is proceeding *pro se*, a <u>Roseboro</u> Notice was issued on June 15, 2010. (Doc. 17). On September 7, 2010, Petitioner filed a Consolidated Response and Memorandum of Law in Support of Petitioner's Motion in Opposition to the Respondent's Motion for Summary Judgment. (Doc. 25). Accordingly, this case is ripe for review.

## I. Factual and Procedural Background

### A. Petitioner's Conviction and Sentence

According to the record, on September 6, 2002, the Grand Jury sitting in Harrison County, West Virginia, returned an indictment charging Petitioner with one count of Second Degree Robbery. (Doc. 15-1, p. 2) On November 21, 2002, a Harrison County petit jury convicted

Petitioner of Second Degree Robbery. (Doc. 15-2, p. 4).[1] On December 3, 2002, the State filed a Recidivist Information pursuant to West Virginia Code § 61-11-18. (Doc. 15-3, p. 2). Petitioner's recidivist hearing was held on April 25, 2003, and a petit jury found that Petitioner was the same person who had been convicted of Nighttime Burglary in 1991 and Possession of a Controlled Substance with Intent to Deliver in 1998. (Doc. 15-4, p. 2). By Order entered May 21, 2003, Petitioner was sentenced to life with mercy on the Second Degree Robbery Charge and a concurrent sentence of 1 to 10 years on Breaking and Entering. (Doc. 15-5, pp. 4-5).

**B.  Direct Appeal**

Petitioner appealed his conviction and sentence to the West Virginia Supreme Court of Appeals on January 27, 2004. In his appeal, Petitioner asserted the following ground for relief:

The Circuit Court of Harrison County, West Virginia[,] erred in denying the Defendant's Motion for Judgment of Acquittal because the State did not prove beyond a reasonable doubt that James Michael Talerico was intimidated or fearful[,] which is a required element in a conviction for Second Degree Robbery. (Doc. 1, p.2).

Petitioner's direct appeal was summarily denied by the West Virginia Supreme Court of

---

[1]Gladys Knotts and James Talerico were employees of the Bob Evans Restaurant in Bridgeport, Harrison County. Ms. Knotts made daily deposits at the United National Bank located inside a Wal-Mart in Clarksburg, Harrison County, West Virginia. On April 23, 2002, Gladys Knotts, accompanied by James Talerico drove to the Wal-Mart to make a deposit. They parked the vehicle and proceed to walk towards the Wal-Mart. Mr. Talerico carried a black box in his right hand which contained the money to be deposited. A man came from behind Ms. Knotts and Mr. Talerico, grabbed the box, ran towards a blue SUV, jumped in and drove away. James Talerico did not testify at trial. The only direct testimony presented by the State with respect to the taking of the box was that of Glady Knotts and Kasey Thacker, who had been apprehended just after the robbery. Ms. Thacker initially denied any involvement but later confessed to the crime and implicated Petitioner and Belinda Stonebreaker. At Petitioner's trial, Ms. Thacker invoked her Fifth Amendment Right, and after being granted immunity, testified against Petitioner.

Appeals on March 10, 2004. (Doc. 15-6).

**C.  Petitioners' State Habeas Petition**

In his state habeas petition, filed on August 4, 2004, Petitioner raised the following grounds for relief:

(1)     Petitioner's right to a fair trial and effective assistance of counsel was violated when his trial attorney failed to subject the Prosecution's case to a meaningful adversarial challenge;

(2)     Prosecutor John A. Scott violated his State and Federal Constitutional rights under the State of West Virginia's and the United States' Constitution to Equal Protection, due process of law, and a fair and impartial petit jury trial because the prosecutor committed prosecutorial misconduct;

(3)     The Circuit Court abused its discretion by committing numerous reversible and prejudicial errors;

(4)     Petitioner's constitutional right to confrontation was violated when the State and Court failed to produce the body of alleged victim Jamie Ford A.K.A. James Talarico [sic];

(5)     The Circuit Court of Harrison County, West Virginia[,] erred in denying the Defendant's Motion for Judgment of Acquittal because the State did not prove beyond a reasonable doubt that James Michael Talarico [sic] was intimidated or fearful[,] which is [a] required element in a conviction for Second Degree Robbery;

(6)     The trial court erred in sentencing him to a term of life imprisonment pursuant to the "Recidivist Information" in that it violates West Virginia Constitution Article III, Section 5 that prohibits a penalty that is not proportionate to the character and degree of an offense.  Thus, Petitioner argues imposition of said sentence shocks the conscience and is [an] error, especially in

light of the circumstances of the case which constitutes [sic] a disproportionate sentence and cruel and unusual punishment also in violation of the Eighth Amendment to the United States Constitution; and

(7)     The trial court committed numerous reversible and prejudicial errors, which violated his guaranteed state and federal constitutional rights to equal protection, due process of law, and a fair and impartial jury trial, due to the cumulative effect of numerous errors committed by the trial court judge, state prosecuting attorney and counsel during trial preventing him from receiving a fair trial which requires the application of the plain error doctrine. (Doc. 15-7).

After counsel was appointed, Petitioner filed an amended petition asserting the following grounds for relief:

(1)     During the pre-plea negotiations by and between Petitioner's trial counsel and the State of West Virginia, a proposal was made by trial counsel at the behest of Petitioner that a polygraph examination be scheduled and that in the event said Petitioner passed such an examination, the robbery charges against him would be voluntarily dismissed by the State.  The proposal was ultimately agreed to by the prosecutor.  A polygraph examination was scheduled and Petitioner was informed of its scheduling.  When Petitioner was notified, however, that the examiner would be a West Virginia State policeman, he objected and instructed trial counsel to make arrangements with the prosecutor for the rescheduling of the polygraph examination to be conducted by an examiner not affiliated in any manner with the State of West Virginia.  Petitioner's trial counsel failed to honor or follow through with his client's reasonable and timely request to make arrangements for an independent polygraph examiner and, as a result, the aforementioned plea deal was never able to be consummated prior to trial.  Petitioner was thereafter convicted of robbery

based solely and exclusively upon the uncorroborated testimony of one Kasey Thacker who, herself, was never subject to a polygraph examination notwithstanding representations by the Clarksburg Police Department to trial counsel to the contrary. Following his conviction and per the arrangement of Petitioner's appellate counsel, Petitioner was subjected to three separate polygraph examinations administered by nationally renowned polygraph examiner Morris Ragus of Pittsburgh, Pennsylvania, formerly the chief polygraph instructor for FBI at Quantico, Virginia. Mr. Ragus has filed a report indicating an unequivocal finding that Mr. Merritt passed all three examinations relative to his claims that he did not participate in any fashion in the robbery alleged in the underlying indictment. As a result, various of Petitioner's constitutional rights to due process and effective assistance of counsel have been violated by trial counsel's unreasonable and unexplainable dereliction of his responsibilities in arranging for a polygraph examination by an independent examiner pursuant to a plea agreement which had already been struck, all of which such failure on trial counsel's part constitute clear and plain ineffective assistance on his part;

(2) A key piece of evidence which has ultimately proven post-conviction to be wholly exculpatory to Petitioner was a surveillance videotape made from footage captured by a camera located on the subject Wal-Mart's store front. It presently appears, based on appellate counsel's investigation of this matter thus far, that said videotape was provided to Petitioner's trial counsel only days prior to trial and only following the filing of a motion to compel by trial counsel. Petitioner requested/instructed his trial counsel to seek the forensic analysis of the subject videotape, but trial counsel failed or refused to do so. It has now been determined, however, through forensic testing done by a nationally renowned laboratory in California, that the masked perpetrator in the videotape was not taller than 5 foot 10 inches, and given the fact that Petitioner, Clifford Merritt,

is 6 foot 4 and ½ inches tall, such forensic evidence would have provided to Petitioner a complete and absolute defense at trial. As a result, Petitioner's various constitutional rights have been violated inasmuch as: (1) the State of West Virginia purposefully and intentionally withheld said videotape during the discovery process knowing Petitioner's trial counsel would be unable to have the same forensically analyzed prior to trial, thereby precluding said Petitioner the opportunity of that defense; or (2) trial counsel should have moved to continue the trial to permit the forensic analysis of said videotape and/or should have made additional efforts for its immediate analysis prior to trial, but his failure to do either constituted clear and plain ineffective assistance on his part; and

(3)     On November 6, 2002, Petitioner was tried in the Circuit Court of Harrison County before the Honorable John Lewis Marks, for the offense of breaking and entering. He was thereupon convicted. His trial on the robbery charges underlying this habeas action began on November 19, 2002, in the very same courtroom before the very same Judge. Notwithstanding local publicity of Petitioner's conviction on November 6, trial counsel (who was the same for both trials) failed to: (1) file a motion to change venue; (2) file a motion to continue the trial; or (3) conduct any voir dire whatsoever relative to the jury panel's knowledge, awareness and/or participation in or of the breaking and entering conviction/trial which had occurred less than (2) weeks earlier. Petitioner's various constitutional rights were thereby violated as a result of trial counsel's ineffective assistance as aforesaid. Furthermore, it is presently unclear from the record as to whether or not separate and distinct jury panels were provided for the trials of Mr. Merritt on November 6, 2002, and November 19, 2002, respectively. To the extent that evidence may be developed at the omnibus hearing to support any contention that Mr. Merritt was unable to impanel a fair and impartial jury due to any issues relative to the impaneling of the juries on those dates aforesaid,

6

Petitioner will have had various of his constitutional rights violated as a result. (Doc. 15-8).

On July 16, 2007, Petitioner's second habeas counsel filed a Second Supplemental Petition/Memorandum for Post Conviction Habeas Corpus Relief alleging the following grounds for relief:

(1)      Petitioner was denied his federal constitutional right to a fair trial and effective assistance of counsel;

(2)      Petitioner was denied his state and federal right to equal protection, due process of law and a fair and impartial trial due to prosecutorial misconduct by John A. Scott, prosecutor for Harrison County, West Virginia at time of alleged offense;

(3)      The Circuit Court abused its discretion by committing numerous reversible and prejudicial errors;

(4)      Petitioner's constitutional right to confront his accuser was violated when the State and Court failed to produce the body of alleged victim James Talarico [sic] a.k.a. Jamie Ford;

(5)      The Court erred in denying the Defendant's motion for judgment of acquittal because the State did not prove beyond a reasonable doubt that James Michael Talarico [sic] was intimidated or fearful[,] which is a required element in a conviction for second degree robbery;

(6)      The trial court erred in sentencing him to a term of life imprisonment pursuant to the recidivist information that was filed after his conviction;

(7)      The trial court committed numerous reversible and prejudicial errors[,] which violated high state and federal constitutional rights to equal protection, due process of law, and a fair and impartial trial as a result of the cumulative effect of all the errors by the Court, the prosecutor, and defense counsel;

(8)     Petitioner's constitutional rights have been violated inasmuch as: (1) the State purposefully and intentionally withheld a key videotape during the discovery process and (2) trial counsel failed to continue the trial or have an immediate analysis performed on the Wal-Mart videotape;

(9)     The State failed to produce two key pieces of evidence despite defense counsel's motion (1) included [sic] the surveillance video from the Go-Mart which [sic] and (2) key exculpatory information regarding a plea offer to the co-defendant two weeks before the defendant's trial; and

(10)     The forensic analysis of the Wal-Mart surveillance camera, which was discovered after trial, corroborates the testimony of Kay Knotts that the alleged assailant was approximately 5'10" or under.  This newly discovered evidence requires reversal in as much as the Defendant is 6'4" inches. (Doc. 15-9).

On June 2, 2009, after two omnibus hearings conducted on July 16, 2007, (Doc. 15-11) and December 17, 2007, (Doc. 15-12) the Circuit Court denied Petitioner's initial, amended, and second amended petitions for writ of habeas corpus. (Doc. 15-13).

On November 20, 2009, Petitioner filed an appeal of the denial of his state habeas petition with the West Virginia Supreme Court of Appeals claiming the following grounds for relief:

(1)     The Prosecution suppressed favorable material evidence that violated Petitioner's due process and 14th Amendment rights when it failed to disclose a pre-trial agreement with Ms. Thacker, the co-defendant, that if she testified and talked with the State before the trial of Petitioner, the State would, in return, request immunity on her behalf;

(2)     Petitioner's trial counsel was ineffective when he failed to personally ascertain the

whereabouts and contents of the Go-Mart security video that was used as a basis for testimony in the Grand Jury proceedings resulting in his client's indictment; and

(3)     The Prosecutor's failure to disclose the agreement of immunity thereby gaining a tactical advantage in eliciting Ms. Thacker's testimony and an advantage in the Prosecutor's summation by bolstering Ms. Thacker's credibility, amounted to prosecutorial misconduct, thereby denying Petitioner the right to a fair trial and warranting a new trial. (Doc. 1, pp. 3-4).

The West Virginia Supreme Court of Appeals denied Petitioner's appeal by Order entered March 4, 2010. (Doc. 15-14).

**D.  Petitioner's Federal Habeas**

In his federal habeas petition, Petitioner raises the following grounds for relief:

(1)     The Prosecution suppressed favorable material evidence that violated Petitioner's due process and 14th Amendment rights when it failed to disclose a pre-trial agreement with Ms. Thacker, the co-defendant, that if she testified and talked with the State before the trial of Petitioner, the State would, in return, request immunity on her behalf;

(2)     Petitioner's trial counsel was ineffective when he failed to personally ascertain the whereabouts and contents of the Go-Mart security video that was used as a basis for testimony in the Grand Jury proceedings resulting in his client's indictment; and

(3)     The Prosecutor's failure to disclose the agreement of immunity thereby gaining a tactical advantage in eliciting Ms. Thacker's testimony and an advantage in the Prosecutor's summation by bolstering Ms. Thacker's credibility, amounted to prosecutorial misconduct, thereby denying Petitioner the right to a fair trial and warranting a new trial.

**E.  The Respondent's Answer and Motion for Summary Judgment**

Respondent contends that Petitioner's first argument is grounded in the timing of disclosure and therefore has no merit. In his first argument, Petitioner argues that his federal right of due process under the 14th Amendment was violated when counsel for the State withheld evidence. Respondent contends that Petitioner's due process rights were not violated because Petitioner's trial counsel knew before his cross-examination of Kasey Thacker that the State asked the trial court to grant her immunity. Respondent contends that the State disclosed its role in Ms. Thacker's decision to invoke her 5th Amendment right against self-incrimination before she testified; therefore, Petitioner's trial counsel had the opportunity to impeach Ms. Thacker using the immunity agreement. Respondent continues stating that with respect to the timing of prosecutorial disclosure, due process only requires that disclosure of exculpatory evidence occur giving the defendant time to make effective use of the material. (LaMere v. Risley, 827 f.2d 622, 625 (9th Cir. 1987). Because counsel for the State disclosed the details surrounding Ms. Thacker's testimony, Respondent contends that Petitioner's due process rights were not violated.

As to Petitioner's second argument, Respondent contends that Petitioner cannot meet the two-part test for ineffective assistance of counsel. Specifically, Respondent contends that Petitioner's trial counsel used objectively reasonable means to obtain a copy of the video; therefore, Petitioner cannot show that trial counsel's conduct fell below an objective standard of reasonableness. Further, Respondent contends that although Petitioner's trial counsel was unable to view the Go-Mart surveillance video, Petitioner's habeas counsel viewed the video and conceded that the video depicts two vehicles that appear to be the same vehicles involved in the crime. Finally, Respondent contends that Petitioner failed to demonstrate how trial court counsel's viewing of the video before trial would have changed the outcome of the trial.

Respondent contends that Petitioner's third argument is merely a restatement of his first argument and that while he frames his first argument as a violation of due process, Petitioner is actually alleging that his due process rights were violated through prosecutorial misconduct, which is Petitioner's third argument. Using the test for prosecutorial misconduct, Respondent contends that Petitioner cannot prove he was prejudiced in any way because Petitioner's trial counsel knew the details surrounding Ms. Thacker's immunity agreement prior to trial.

## F. **Petitioners' Response to Respondent's Motion for Summary Judgment**

Petitioner replies that counsel for the state intentionally failed to disclose and withheld exculpatory and impeachment evidence from the defense, jury and court regarding an immunity agreement reached and finalized with Kasey Thacker two weeks before trial. Pointing to various aspects of Ms. Thacker's testimony, as well as the failure of the prosecutor to correct inaccuracies, Petitioner argues that the State clearly violated Brady[2] and its progeny and requests that this Court reverse the decision of the lower Court.[3]

In addition, Petitioner replies that his constitutional right to effective assistance of counsel was violated as a result of defense counsel's deficient performance. More specifically, Petitioner argues that the prosecutor violated discovery requirements when he failed to provide defense counsel with a copy of a surveillance tape which contained both exculpatory and impeaching evidence, and defense counsel's inability to recognize the substantive nature of the violation and his failure to pursue any type of procedural and/or substantive challenges "so undermined the proper functioning

---

[2]Brady v. Maryland, 373 U.S. 83 (1963).

[3]It is not clear to the undersigned whether Petitioner is referring to the trial court, the habeas court, or the West Virginia Supreme Court of Appeals. However, it would seem clear that Petitioner is seeking an Order vacating his conviction.

of the adversarial process that [his] trial cannot be relied on as having produced a just result." (Doc. 25, p. 16).

Finally, Petitioner replies that the prosecutor's failure to disclose exculpatory and impeachment evidence further infringed upon his constitutional right to a fair trial when the prosecutor/police intentionally vouched for Kasey Thacker's character and thereby bolstered her credibility.

## II.  Standards of Review

### A.  Summary Judgment

The Supreme Court has recognized the appropriateness of Rule 56 summary judgment motions in habeas cases.  See Blackledge v. Allison, 431 U.S. 63, 80 (1977).  So too has the Fourth Circuit Court of Appeals.  Maynard v. Dixon, 943 F.2d 407 (4th Cir. 1991).  Pursuant to Rule 56© of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Motions for summary judgment impose a difficult standard on the moving party; for it must be obvious that no rational trier of fact could find for the nonmoving party.  Miller v. Federal Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990).  However,  the "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Anderson v Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]."  Id.  "If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted." <u>Felty v. Graves-Humphreys Co.</u>, 818 F.2d 1126, 1128 (4th Cir 1987). Such evidence must consist of facts which are material, meaning that the facts might affect the outcome of the suit under applicable law, as well as genuine, meaning that they create fair doubt rather then encourage mere speculation. <u>Anderson</u>, 477 U.S. at 248. It is well recognized that any permissible inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-588 (1986).

**B.  <u>Federal Habeas Review Under 28 U.S.C. § 2254</u>**

Notwithstanding the standards which govern the granting of a motion for summary judgment, the provisions of 28 U.S.C. § 2254 must be examined to determine whether habeas relief is proper. Title 28 U.S.C. § 2254 requires a district court to entertain a petition for habeas corpus relief from a prisoner in State custody, but "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "Federal habeas relief does not lie for errors of state law." <u>Thomas v. Taylor</u>, 170 F.3d 466, 470 (4th Cir. 1999); <u>see</u>, <u>also</u>, <u>Weeks v. Angelone</u>, 176 F.3d 249, 262 (4th Cir. 1999). Regardless, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State Court shall not be granted unless it appears that...the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A).

The "exhaustion" doctrine requires a federal habeas Petitioner to have presented all federal claims - *in federal terms* - to the highest state court prior to presenting them for federal habeas review. <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971) (citations omitted). This requirement ensures the State is given the "opportunity to pass upon and correct alleged violations of its prisoners'

federal rights." Id. To exhaust a claim in state court, Petitioner must "expressly raise[] that same federal constitutional claim in state court that he raises in federal court." Diaz v. Weisner, 2006 U.S. Dist. LEXIS 56583, at *31 (W.D.N.C. Aug. 1, 2006). "It is not enough that all the facts necessary to support the federal claim were before the state court or that a somewhat similar state-claim was made." Anderson v. Harless, 459 U.S. 4, 6 (1982) (citations omitted).

Even if a Petitioner is found to have exhausted his state remedies, the federal court may not grant habeas relief for claims adjudicated on their merits by the state court unless the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved in an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States;

or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C. § 2254(d)(1) and (2); see also Williams v. Taylor, 529 U.S. 362 (2000).

The Fourth Circuit Court of Appeals has determined that "the phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." Thomas v. Taylor, 170 F.3d 466, 475 (4th Cir. 1999). When a state court summarily rejects a claim and does not set forth its reasoning, the federal court independently reviews the record and clearly established Supreme Court law. Bell v. Jarvis, 236 F.3d 149 (4th Cir.), cert. denied, 524 U.S. 830 (2001) (quoting Bacon v. Lee, 225 F.3d 470, 478 (4th Cir. 2000)). However, the court must still "confine [its] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" Id.

at 158.

A federal habeas court may grant relief under the "contrary to" clause if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A federal court may grant a habeas writ under the "unreasonable application" clause, "if the state court identifies the correct governing legal principle from the Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. "An unreasonable application of federal law is different from an incorrect application of federal law." Id. at 410.

When a Petitioner challenges the factual determination made by a state court, "federal habeas relief is available only if the state court's decision to deny post-conviction relief was 'based on an unreasonable determination of the facts.'" 28 U.S.C. § 2254(d)(2). In reviewing a state court's ruling on post-conviction relief, we are mindful that 'a determination on a factual issue made by a State court shall be presumed correct,' and the burden is on Petitioner to rebut this presumption 'by clear and convincing evidence.'" Tucker v. Ozmint, 350 F.3d 433, 439 (4th Cir. 2003).

Habeas corpus relief is not warranted unless the constitutional trial error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Richmond v. Polk, 375 F.3d 309 (4th Cir. 2004). "Under this standard, habeas Petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" Brecht, 507 U.S. at 637.

### III.  Analysis

**A.      Ground One:  Whether the Prosecution Suppressed Favorable Material Evidence that Violated Petitioner's Due Process and 14th Amendment Rights When it Failed to Disclose a Pre-Trial Agreement with Ms. Thacker, the Co-Defendant, that if she Testified the State would, in Return, Request Immunity on her Behalf**

**and**

**Ground Three:   Whether the Prosecutor's Failure to Disclose the Agreement of Immunity Thereby Gaining a Tactical Advantage in Eliciting Ms. Thacker's Testimony and an Advantage in the Prosecutor's Summation by Bolstering Ms. Thacker's Credibility Amounted to Prosecutorial Misconduct, Thereby Denying Petitioner the Right to a Fair Trial and Warranting a New Trial**

Petitioner claims that the State violated his due process rights under the 14th Amendment by failing to disclose a pre-trial immunity agreement with Kasey Thacker.  According to Petitioner, the State failed to disclose the presence and details of the immunity agreement prior to trial, and this prevented defense counsel from effectively cross-examining Ms. Thacker and prevented the jury from hearing all necessary facts.  Accordingly, Petitioner argues he was not afforded a fair trial.

A review of the record establishes that the State advised Petitioner's counsel that it intended to offer leniency to Ms. Thacker.  Specifically, the State supplemented its discovery responses on October 4, 2002, with the following:

> Kasey Thacker was offered, in exchange for her cooperation with
> the State in the prosecution of the defendant in this matter, a plea
> by information to the charge of Accessory After the Fact, a violation
> of W.Va. Code 61-11-6, with an agreement of a one year sentence
> suspended, two years probation, and a dismissal of the felony charge.

(Doc. 15–19, p.3)

However, Ms. Thacker declined the State's offer.   When Ms. Thacker appeared at Petitioner's trial, she exercised her right against self-incrimination under the Fifth Amendment, and

was granted immunity by the trial court, apparently at the State's request.[4]  (Doc. 15-15, p. 58).

As part of the habeas proceedings, counsel for the State, Kurt Hall, was deposed and testified he had informed Ms. Thacker's counsel before trial that he intended to call Ms. Thacker as a witness, and if she invoked her Fifth Amendment right against self-incrimination, he intended to ask the Court to grant her immunity:

Q:     So it was kind of orchestrated ahead of time –

A:     We knew how procedurally it was going to go.  We didn't know whether the judge would go along with it or not. But I had told her that I'm going to call her as a witness and she said I'm going to plead the fifth, her attorney did, and I said, well, you know, if you do that, then I have to have you.

(Doc. 15-10, p. 97).

Describing his pretrial interaction with Ms. Thacker's counsel, counsel for the State testified:

Q.     You used the term immunity agreement.  Was there eventually an agreement between you and Kasey about immunity or was – the way I understand it you said [Ms. Thacker's counsel] said if you call her up, she's going to take the fifth.  And you said, of, if she does that, I'm going to --

A.     I think that's the way it went.  I don't think there was any paperwork signed.  Basically, like I said, I tried to get her to plead, she wouldn't do it and I told – you know.

I don't even know if I had her subpoenaed yet or not, but I told her to turn in her caller.

She say[s], "I'm going to tell her to plead the fifth." And I said, "Well, then I don't have no [sic] choice but to do this."

We kind of knew that's the way it was going to proceed.

(Doc. 15-10, p. 113)

_____

[4]The record before the Court does not reflect when Ms. Thacker invoked her 5th Amendment right.  The transcript of her trial testimony begins after she was granted immunity by the Court.

At the habeas hearing on April 20, 2007, counsel for the State produced an unsigned letter, dated November 7, 2002, and addressed to Nancy Ulrich, Ms. Thacker's counsel. The letter appears to summarize a previous conversation between the two and outlines a plea offer for Ms. Thacker:

> In exchange for the State dismissing the Felony charge against your client with prejudice, and requesting immunity for your client in these matters, the State would require your client to cooperate in the prosecution of Clifford Merrit [sic] and Belinda Stonebreaker by...

(Doc. 15-9, p. 65). In addition, counsel for the State produced an unsigned Order Dismissing Indictment. The Order provides that Ms. Thacker was subpoenaed on November 19, 2002, to testify in Petitioner's criminal case. The Order further provides that Ms. Thacker invoked her fifth amendment privilege against self incrimination. Accordingly, the Order indicates that the State proffered that it would be in the best interest of justice to order the defendant to testify in the matter. Finally, the Order indicates that after hearing arguments, the Court ordered Ms. Thacker to testify and granted her immunity. (Doc. 15-9, pp. 67-68).

In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith or the prosecution" Id. at 87. "There are three components of a true Brady violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-282 (1999). "Brady is not limited to formal plea bargains, or other notarized commitments. It applies to 'less formal, unwritten, or tacit agreement[s]' so long as the prosecution offers the witness a benefit in exchange for his cooperation,...so long in other words as the evidence is 'favorable to the accused.'" Harris v. Lafler,

553 F.3d 1028, 1035 (6th Cir. 2009) (quoting <u>Bell v. Bell</u>, 512 F.3d at 233, and <u>United v. Bagley</u>, 473 U.S., 667, 678 (1985).

Here, the record establishes that the prosecution made assurances or representations to Ms. Thacker's counsel and/or Ms. Thacker suggesting the existence of a mutual or tacit agreement favorable to Petitioner because of its impeachment value. Because there is no evidence that the prosecution disclosed this to counsel for Petitioner, the prosecution violated its <u>Brady</u> obligation.

However, the prosecution's violation of its <u>Brady</u> duty of disclosure warrants habeas relief only if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Kyles v. Whitley</u>, 514, U.S. 419, 433-34 (1995). Here, although no direct evidence of an informal agreement or mutual understanding between Ms. Thacker and the prosecution was introduced, the jury heard that she was granted immunity so that she would testify. (Doc. 15-5, pp. 58-59). Moreover, she was subject to cross-examination by Petitioner's counsel after the court had granted her immunity. His cross-examination would arguably have been **more** effective if evidence of the mutual understanding had been disclosed prior to trial, but only incrementally so, at best. There is no reason to believe that disclosure of the mutual understanding would have so altered the jury's assessment of Ms. Thacker's credibility as to give rise to a reasonable probability that the outcome of the trial would have been different. Accordingly, the prosecution's <u>Brady</u> violation does not provide a basis for granting Petitioner's writ.

In its Motion for Summary Judgment, Respondent contends that Petitioner's Ground Three is the same argument as Petitioner's Ground One. Petitioner's third ground is that "the prosecutor's constitutional duty to disclose exculpatory and impeachment evidence – (immunity agreement – see ground A.) – further infringed upon Petitioner's constitutional right to a fair trial when the

prosecutor/police intentionally vouched for Kasey Thacker's character thereby bolstering her credibility." (Doc. 25, p. 21). While this is not an exact replica of Ground One, the Court finds that it is, at the very least, a sub-claim of the first ground and will address it accordingly.

Petitioner's sub-argument is that the prosecutor and police vouched for Ms. Thacker thereby bolstering her credibility. Petitioner's claim for habeas relief in this regard is premised upon the Supreme Court's decisions in Napue v. Illinois, 360 U.S. 264 (1959), and Giglio v. United States, 405 U.S. 150 (1972). As noted by Petitioner, Napue reaffirmed the long-standing principle that "a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction,"[5] and Giglio recognized that the prosecution's "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice' and, as such, due process."[6]

Petitioner argues that the prosecutor and the police, specifically Detective Matheny, engaged in misconduct by vouching for and bolstering the credibility of Kasey Thacker. Petitioner cites to the following testimony as evidence of how the prosecutor initially vouched for and bolstered Ms. Thacker's credibility:

Q.      In fact, in this case today earlier when you were subpoenaed to testify,
        you advised the Court that you were going to take the Fifth Amendment,
        is that correct?

A.      Yes, it was

Q.      And[.] The Court ordered you to testify in this case, is that correct?

A.      Yes, it was.

_____

[5] 360 U.S. at 269.

[6] 405 U.S. at 163 (quoting Mooney v. Holohan, 294 U.S. 103 (1935).

(Doc. 15-15, p. 54).

Peititioner argues that the prosecutor makes it appear that Ms. Thacker had no intention of testifying when, in fact, an immunity deal had been reached two weeks before the trial and she was fully aware that she would be testifying at the trial under the immunity agreement. Moreover, although the prosecutor did not specifically ask Ms. Thacker whether she received a deal for her testimony, during cross-examination defense counsel asked the specific question whether she was **offered immunity** for her testimony, and she replied, "Well, I don't know, I came in and I took the Fifth and he (trial judge) said that I had to testify." (Doc. 15-15, p. 58). Petitioner maintains that the question directed by defense counsel was whether she was offered immunity from prosecution, not whether Court had granted her immunity. Petitioner maintains that the record is now clear that she was offered immunity in exchange for her testimony, and the prosecuting attorney did not correct the testimony even though he knew it to be false and misleading. The undersigned is not so persuaded. The question simply asked whether she was offered immunity, and Ms. Thacker may well have understood that to be in reference to the Court's grant of immunity. Moreover, while the prosecution may have indicated that it would ask the Court to grant her immunity, it could not "offer" her immunity because that was not within its authority.

Petitioner also argues that trial vouching and bolstering occurred when Detective Matheny offered the following testimony in response to a question from the prosecuting attorney:

Q.     And when you read that statement and it implicated Belinda Stonebreaker
       and Clifford Merritt, what other, what else did you do in your
       Investigation to try to confirm or dispel what Kasey Thacker told
       Detective Sedlock in this statement as far as physical evidence?

A.     Well, once we received the statement from Kasey, **the truthful
       statement** that she gave on the night it occurred, we were able
       to develop the link between Clifford, Belinda, and Kasey, knowing that

there was a link between the three (3) of them.  We then put out an
alert message for units to be on the lookout for the white vehicle that
was testified to that was also used in this robbery.  Due to Kasey's
testimony we had reason to believe that Clifford and Belinda were
 traveling in that vehicle.

(Doc. 15-15, p. 89).

It appears that Petitioner is arguing that Detective Matheny vouched for the credibility of Ms.

Thacker's testimony when he referred to the truthful statement she gave on the night the crime

occurred.  However, a thorough review of the record indicates that Detective Matheny was simply

differentiating from her initial statement that she had no involvement in the crime with her statement

later that evening that detailed her involvement.  (Doc. 15-9, p. 148).

Petitioner also finds objectionable the reference made by Detective Matheny to the white

vehicle that was used in the robbery.  Petitioner maintains that "[i]t is very clear that Detective

Matheny knew that the record from the department of motor vehicles and grand jury transcript

would dispute his trial testimony if he again verified the vehicle as belonging to Cindy Thacker;

therefore, he makes no attempt to verify the ownership and refers to the testimony that was already

provided... Detective Matheny's testimony vouches for the veracity of Kasey Thacker and Cindy

Thacker's statement and trial testimony even though he knew that it was unsupported by the record."

(Doc. 25, p. 26). The undersigned is at a loss to understand this argument.  The Grand Jury transcript

indicates that Detective Matheny testified that he "pulled the video, well surveillance cameras from

the GoMart over in Bridgeport, which is next to Bob Evans and I found that the white car that

belongs to Cindy Thacker and the blue Explorer that was involved in the robbery were sitting in the

area and you could see them pull out shortly after the people left with the money." (Doc. 15-9, p.

150). To the  extent that Petitioner attempts to establish that Cindy Thacker did not own a 1989

Dodge Spirit, as testified to by Kasey Thacker, his record from LOCATE, is dated November 21, 2004, and does not indicate anything other than what vehicles were owned by Ms. Thacker and her mother on that date, and would not indicate whether Cindy Thacker owned a 1989 Dodge Spirit in 2002, and later sold it. (Doc. 25-2, pp. 10-2). More importantly, the 1990 Dodge Spirit which his record from LOCATE shows as being owned by LD Lockhart since July 15, 1998, was titled in the name of C Thacker or L D Lockart on July 15, 1998, and there is no evidence that she did not have it in her possession at the time of the robbery. (Doc. 15-9, p. 97). It is true that Kasey Thacker testified that at the time of the robbery, her mother owned a Blue 1990 Dodge Spirt and a White 1989 Dodge Spirit. However, at her deposition in June of 2007, Kasey Thacker acknowledged that she might have the year of the vehicles reversed, but was emphatic that Belinda Stonebreaker was driving the White Dodge Spirit on the date of the robbery. It is also pertinent to note that no other witness, including Detective Matheny ever indicated the year of the vehicle in the tape. Consequently there is no evidence of any discrepancy in Detective Matheny's testimony, and hence, no basis for a finding that his testimony was an effort to bolster Ms. Thacker's testimony.[7]

Petitioner also calls the Court's attention to the following comments made by the prosecutor in closing statements that he argues compounded Ms. Thacker's trial testimony with her statement she had given to the police:

> I haven't had the chance to talk to you about Kasey Thacker's

---

[7]Ms. Thacker testified that she lived with her mother, and they had three vehicles at the time of the robbery. A 89 Dodge Spirit; a 90 Dodge Spirit and a 85 Buick Regal. She further testified that Buick was not "running" at the time, and that was her vehicle. (Doc. 15-15, p. 34). Additionally, Cindy Thacker, Kasey Thacker's mother testified that she had a white Spirit that was borrowed by Belinda Stonebreaker at approximately 10:00 on the morning of the robbery. (Doc. 15-15, p. 76).

> testimony and how she's not going to be prosecuted, and I think
> they are going to try to make a big deal out of that. I think by now
> you realize that **except for Kasey Thacker's testimony, this case might
> be over[.]**
>
> Remember when she gave her statement, and I asked her, "Did anybody
> promise you anything, did anybody threaten you, did they offer you a
> reward, did they offer you a deal, anything [?]...**Nobody else told the
> truth, other than Kasey Thacker.**

(D0c. 25-1, p 4). The undersigned finds no violation in these closing arguments. The prosecutor is referring to the statement that Ms. Thacker gave to the police the night of the robbery, and there is nothing in the record to suggest that she was offered any kind of deal for her statement. This is reinforced by the fact that she was indicted on felony charges for her role in the crime. Furthermore, there is nothing inherently prejudicial about these remarks.

Finally, Petitioner points to the prosecutor's summation and his statement that: "[t]hey keep wanting to tell you that she got a deal. Well, she was ordered to testify. She took the stand and she said, I refuse." And the Judge said, I order you to testify." (Doc. 25-1, p. 17). Accordingly, Petitioner argues that the jury went into deliberations with the false impression that Ms. Thacker did not receive a deal from the prosecuting attorney.

First, the undersigned notes that the "transcript" of the closing arguments tendered by Petitioner is clearly not an official transcript. Moreover, the words "a deal" are handwritten in over the word beat. However, even if the prosecutor did make the statement as recited above, the undersigned does not find that it warrants reversal.

Even if the prosecutor's statement was improper, "reversal is not warranted unless the defendant has been unfairly prejudiced by the comment." United States v. Brockingtonn, 849 F.2d 872, 875 (4th Cir. 1988), *overruled on other grounds by* Bailey v. United States, 516 U.S. 137

(1995). Factors to be considered in determining whether improper comments were so damaging to a defendant's trial as to require reversal include: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.  See United States v. Mitchell, 1 F.3d 235, 241 (4th Cir. 1993) (internal citations omitted); See also United States v. Harrison, 716 F.2d 1050 (4th Cir. 1983). Under this four-part standard, it is clear that the remark, if made, and if improper, does not warrant reversal.

Not only was it an isolated comment, it clearly cannot be interpreted as an attempt to divert the jury's attention to extraneous matters. Moreover, the jury was informed that Ms. Thacker had been indicted for the same crime as Petitioner, and that she was granted immunity in exchange for her testimony.  Whether  the potential grant of immunity was known to her up to two weeks before the trial appears to be immaterial to her credibility. Finally, the remark does not reference the guilt of the defendant and there was competent proof introduced to establish Petitioner's guilt. Accordingly, for all the reasons discussed, Petitioner's Ground 3 does not warrant habeas relief.

**B.      Ground Two: Whether Petitioner's Trial Counsel was Ineffective when he Failed to Personally Ascertain the Whereabouts and Contents of the Go-Mart Security Video that was Used as a Basis for Testimony in the Grand Jury Proceedings Resulting in his Client's Indictment**

A thorough review of the record establishes that the robbery in question occurred while two employees of Bob Evans were attempting to deposit money in the United National Bank located inside a Wal-Mart in Clarksburg, Harrison County, West Virginia.  Trial testimony established that

Belinda Stonebreaker borrowed a white car from Cindy Thacker, and then she and Petitioner met

Kasey Thacker, who was driving a Ford Explorer, at approximately 2:00 by the old police station

in Bridgeport. At the rendevous point, Petitioner got out of the white car and into the Ford Explorer

with Ms. Thacker. Both vehicles were then driven to an area near Bob Evans. Apparently, Ms.

Stonebreaker went into a Go Mart right beside Bob Evans where she could watch for the employees

to leave with the money to be deposited. Petitioner and Ms. Thacker were parked at the Hampton

Inn which is on the other side of the Bob Evans. When Ms. Stonebreaker saw the employees leave,

she radioed Ms. Thacker, and they followed the car with the Bob Evans' employees to the Wal-Mart

parking lot. After Petitioner grabbed the money, they drove to the Western Steer, where Ms.

Stonebreaker was already waiting. Petitioner got back in the car with Ms. Stonebreaker. Ms.

Thacker then drove to a K-Mart, where she was apprehended by the police and eventually confessed

to her part in the robbery and implicated both Petitioner and Ms. Stonebreaker.

    In addition, the record establishes that there was a surveillance camera at the Wal-Mart

which pans the area. At the preliminary hearing in this matter, Officer Matheny testified that the

video from that camera captured the robbery. In addition, Officer Matheny testified that there was

a video camera at the Go-Mart in Bridgeport, beside Bob Evans. He testified that the tape from that

camera showed "both vehicles, the white vehicle and the blue vehicle leaving the lot and coming

behind the Go-Mart and pulling out behind the folks that were taking the deposit." (Doc. 15-9, pp.

49-50). This testimony parallels the testimony that he gave to the Grand Jury. (Doc. 15-9, pp. 149-

50).

    In the State's Supplemental Responses to Motion for Discovery, Petitioner was advised that

a "video VHS tape from Wal Mart and zip drive from Go Mart would be copied upon receipt of

VHS tape and Zip drive disk from defendant." (Doc. 15-9, p. 71). There does not appear to be any dispute that Detective Matheny copied the zip drive and delivered it to petitioner's trial counsel. Nor, does it appear that there is any dispute that the zip drive was empty. Petitioner now argues that his counsel was ineffective for failing to obtain an undamaged version of the Go-Mart security video. According to Petitioner, upon defense counsel's possession of the zip drive, which purportedly stored the video footage from the Go-Mart security camera, and realization that the zip drive was damaged, counsel should have expended effort to obtain an undamaged copy. Further, Petitioner alleges counsel was ineffective for accepting as true the State's statements as to what was on the video.

Respondent contends that Petitioner's counsel was not ineffective. Respondent first contends that Petitioner cannot demonstrate that defense counsel's representation fell below the objective standard of reasonableness because counsel used every objectively reasonable means to obtain a copy of the tape. Second, Respondent contends that Petitioner cannot prove that counsel's viewing of the video would have made a difference in the outcome of the trial because there was no exculpatory or impeachment evidence on the tape, as conceded by Petitioner's original habeas counsel.[8]

In reviewing Sixth Amendment claims based on ineffective assistance of counsel, the

---

[8]

During his deposition of Kurt Hall, the prosecutor at Petitioner's trial, Mr. Dyer, original habeas counsel for Petitioner, noted that he had been able to recover the contents of the Go-Mart video after going to great lengths. He then notes the following:

> "Well, it does show two vehicles which appears as though they may be the same vehicles that were involved in the crime. But you certainly can't see any people or make them out. Those time-lapsed things are really difficult. In fact, the quality was so bad I don't even see why they bothered doing it. Frankly, I don't know what evidentiary purpose it could ever serve."

(Doc. 15-10, p. 105).

presumption is that counsel rendered effective assistance, and the burden is on Petitioner to establish a constitutional violation.  See Strickland v. Washington, 466 U.S. 668, 689 (1984). Claims of ineffective assistance of counsel are measured under a two-part analysis outlined in Strickland  First, Petitioner must show that his counsel's performance fell below an objective standard of reasonableness.  Id. at 688.  Second, Petitioner must demonstrate he was prejudiced by counsel's performance.  In order to demonstrate prejudice, "the defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  If the defendant shows no prejudice from the alleged ineffectiveness of counsel, courts need not address counsel's performance. Fields v. Att'y Gen. of Maryland, 956 F.2d 1290, 1297 (4th Cir.), cert. denied, 506 U.S. 885 (1992).

The essence of Petitioner's complaint is that his trial counsel was ineffective for failing to obtain a viewable copy of the Go-Mart tape.  However, the record reflects that counsel made reasonable efforts to obtain a copy.  As the State Court found during the State habeas proceedings, Petitioner's trial counsel attempted on numerous occasions to obtain the contents of the Go-Mart video.  After receiving the State's Response to [Petitioner's] Motion to Compel indicating that the State would provide to Petitioner a zip drive believed to contain the surveillance footage from Go-Mart's security camera, Petitioner's trial counsel filed a renewed motion to compel seeking to compel the State to provide the zip drive. (Doc. 15-13, 36).  Petitioner's counsel eventually received the zip drive; however, it was blank.  (Id.).  Counsel then contacted Belinda Stonebreaker, who was also charged in the matter, to determine whether her counsel had a viewable copy of the video.  (Id.). This also proved unsuccessful.  Subsequently at a hearing on the matter in December, the State

advised that it had turned over all evidence in its possession, including the Go-Mart security footage, which was blank. (Doc. 15-12, p. 30). Thus, Petitioner's trial counsel turned his attention to other matters.

In reviewing claims of ineffective assistance of counsel, "judicial scrutiny of counsel's performance must be highly deferential," and the court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 689-90. Moreover, to demonstrate that his counsel's conduct was deficient, Petitioner must show counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. When viewed against the facts and circumstances of the case at the time, Petitioner's counsel was not ineffective. Counsel filed a motion to compel to obtain the zip drive, and upon being made aware that the zip drive was blank, contacted the State and a second co-defendant's counsel to attempt to recover the contents. It was also reasonable for Petitioner's counsel to rely on the representations of the State that all evidence had been turned over, and it too had a blank copy of the zip drive. Accordingly, Petitioner has not demonstrated that counsel's performance fell below an objective standard of reasonableness, and the Court need not determine whether he was prejudiced by counsel's performance.[9]

### III. Recommendation

---

[9]The undersigned is aware that Petitioner maintains that the Go-Mart video establishes that the white car that Ms. Thacker testified was a Dodge Spirit, was in fact, her own Plymouth Alliance. Regardless of whether that revelation would have had a material impact on the outcome of the trial, the Court has only petitioner's unsubstantiated assertion. The disk that an expert created of the tape for habeas counsel was tendered at the omnibus hearing. However, because the prosecution did not have the opportunity to view it, the presiding judge directed counsel to review it, and if there was no objection, submit it. (Doc. 15-12, p. 106). The tape was Marked as Exhibit 25. However, it was not included in Petitioner's binder and was not tendered to the court following the omnibus hearing. (Doc. 15-13, p. 237).

For the reasons set forth in this Opinion, it is recommended that the Respondent's Motion for Summary Judgment (Doc. No. 15) be **GRANTED,** and Petitioner's § 2254 petition be **DISMISSED WITH PREJUDICE**.

Within fourteen (14) days after being served with a copy of this report and recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

 The Clerk is directed to mail a copy of this Opinion/Report and Recommendation to the *pro se* Petitioner and any counsel of record.

DATED: November 19, 2010.

 /s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE