**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**

**CLIFFORD MERRITT,**

        Petitioner,

**v.**                                **Civil Action No. 2:10-CV-47
(BAILEY)**

**WARDEN ADRIAN HOKE,**

        Respondent.

**ORDER ADOPTING IN PART AND REJECTING IN PART
OPINION/REPORT AND RECOMMENDATION**

I.      Introduction

On this day, the above-styled matter came before the Court for consideration of the Report and Recommendation of United States Magistrate Judge James E. Seibert.  By Standing Order, entered on March 24, 2000, this action was referred to Magistrate Judge Seibert for submission of a proposed report and recommendation ("R&R").  Magistrate Judge Seibert filed his R&R [Doc. 28] on November 19, 2010.

Pursuant to 28 U.S.C. § 636(b)(1)(c), this Court is required to make a *de novo* review of those portions of the magistrate judge's findings to which objection is made. However, the Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed.  ***Thomas v. Arn***, 474 U.S. 140, 150 (1985).  In addition, failure to file timely objections constitutes a waiver of *de novo* review and the petitioner's right to appeal this Court's Order.  28 U.S.C. § 636(b)(1);

1

*Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984). Here, objections to Magistrate Judge Seibert's R&R were due within fourteen (14) days after being served with a copy of the R&R pursuant to 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b). After an extension [Doc. 31], the petitioner timely filed his objections on December 20, 2010 [Doc. 33]. Accordingly, this Court will undertake a *de novo* review of those portions of the magistrate judge's findings to which objection is made. The Court will review the remainder of the R&R for clear error.

II.    Statement of Facts

In April 2002, Gladys Kay Knotts and James Michael Talerico were employees of the Bob Evans restaurant in Bridgeport, Harrison County, West Virginia. Knotts, an assistant manager at the restaurant, made daily deposits at the United National Bank located inside the Eastpointe Plaza Walmart in Clarksburg, Harrison County. On April 23, 2002, at approximately 2:15 or 2:30 p.m., Knotts and Talerico, who acted as her escort, left Bob Evans to make the daily deposit. After parking her car, Knotts and Talerico proceeded to walk to the Walmart store entrance. Talerico was carrying a black box in his right hand which contained the money to be deposited at United National Bank. Knotts was walking slightly behind him and to his right. A man came from behind them, grabbed the black box from Talerico, and escaped in a blue SUV.

III.    Procedural History

A.    Indictment through Direct Appeal

On September 6, 2002, a Harrison County Grand Jury returned an Indictment [Doc. 15-1] charging the petitioner, Clifford H. Merritt, with one count of Second Degree Robbery,

2

in violation of W.Va. Code § 61-2-12(b) (Case No. 02-F-186-1).  In particular, the petitioner was charged with being the man who grabbed the black box from Talerico which contained over $4,500.  (Id. at 2).

On November 19, 2002, Kurt W. Hall, Assistant Prosecuting Attorney for Harrison County; the petitioner and his counsel, M. Hance Price; and the lead investigating officer, Robert Matheny, appeared for trial by jury.  ([Doc. 15-2] at 2).  The prosecution called Knotts as its first witness.  Knotts testified that the assailant was a male about six feet tall who wore coveralls, gloves, and a ski mask.  ([Doc. 15-15] at 9-10).  Knotts further testified that the get-away vehicle was a blue SUV, driven by a person with long brown hair.  (Id. at 13, 23).  Knotts was unable to identify the petitioner as the assailant.  (Id. at 17).

As its second witness, the prosecution called Michelle Beto, who works for Clarksburg's local newspaper.  (Id. at 24).  Beto testified that she encountered a blue turquoise SUV while turning into the Eastpointe Plaza on the day of the incident.  The SUV was being driven erratically and nearly caused an accident with Beto.  In an effort to identify the occupants of the SUV, Beto then accelerated and was able to become side by side with the vehicle.  Beto identified the driver as "a man, but all of the sudden, clothes started coming off, a hat, a mustache, and it turned into a young woman with long hair." (Id. at 25).  Beto further testified that there was an individual in the back of the vehicle also changing clothes.  Beto was unable to view the license plate number because there was a piece of cardboard placed over the plate.  (Id. at 26).  Beto then testified that she saw the SUV about a half hour later outside the K-Mart at Eastpointe Plaza, where several law enforcement vehicles had gathered around the vehicle.  (Id. at 27).  According to Beto, she

3

then identified the driver of the SUV to Detective Matheny as Kasey Dawn Thacker.  (Id. at 27-28, 85).

The prosecution then called Kasey Thacker, who had also been indicted for Second Degree Robbery for her participation as the driver.  (Id. at 31-32).  Thacker testified that her friend, Belinda Stonebreaker, approached her the day before the robbery about the vehicles she had available.  (Id. at 37-38).  Stonebreaker, who was living with the petitioner, then told Thacker she was in desperate need for money.  (Id. at 38-39).  According to Thacker, she and Stonebreaker then discussed a plan to rob Bob Evans.  (Id. at 39-40). Thacker was to rent a Ford Explorer, which would be registered in her mother's name, and Stonebreaker was to borrow a white Dodge Spirit from Thacker's mother. Thacker was to disguise herself, cover up the license plate on the Explorer, and meet Stonebreaker and the petitioner at around 2:00 p.m. in Bridgeport.  (Id. at 40).

At the pre-robbery meeting point, Thacker testified, the petitioner exited the Spirit and joined her in the Explorer, already wearing gloves.  The petitioner then clothed himself with coveralls, a hunting-type mask, and a Halloween mask.  (Id. at 42).  Thacker was wearing blue jeans, a windbreaker jacket, a baseball cap, a fake mustache, and a pair of sunglasses.  (Id. at 44).  Thacker and the petitioner assumed their planned position at the Hampton Inn next to Bob Evans, while Stonebreaker positioned herself at the Go-Mart gas station on the other side of the restaurant.  Communicating by walkie-talkie, Stonebreaker radioed that Knotts and Talerico had exited the restaurant to make the daily deposit.  (Id. at 43).  Thacker and the petitioner then followed the Bob Evans employees into the Walmart parking lot.  (Id. at 44).  According to Thacker, the petitioner then exited the

4

Explorer, grabbed the box from Talerico, jumped back into the vehicle, and she drove away.  (Id. at 46).

At the post-robbery meeting point, Thacker testified, she and the petitioner placed into a bag their disguises, which they had removed after leaving the Eastpointe Plaza, and the cardboard that had covered the license plate.  (Id. at 47-48).  The petitioner took the bag, gave Thacker three dollars ($3.00), and left with Stonebreaker.  As planned, Thacker returned to the Eastpointe Plaza K-Mart to make a purchase in an effort to create an alibi.  (Id. at 48-49).  The receipt showed that Thacker purchased a tube of lipstick at 2:44 p.m.  (Id. at 50).  When she exited K-Mart police officers had gathered around the blue Explorer.  After a moment of hesitation, she walked over to the vehicle and was confronted by law enforcement.  (Id. at 51-52).  At first, she denied any participation in the robbery; then, after being advised to consider what the others might say once apprehended, she provided a statement to the same effect as her testimony in court.  (Id. at 53-54).

The assistant prosecutor then questioned Thacker as to how she came to testify in court:

> Q.    In fact, in this case today earlier when you were subpoenaed to testify, you advised The Court that you were going to take the Fifth Amendment, is that correct?
>
> A.    Yes, it was.
>
> Q.    And The Court ordered you to testify in this case, is that correct?
>
> A.    Yes, it is.

(Id. at 55).

5

On cross-examination, the petitioner's defense counsel attempted to elaborate on Thacker's receipt of immunity:

| | |
|---|---|
| [MR. PRICE:] | Okay.  And it's correct that you were offered immunity from prosecution in exchange for your testimony here today, is that correct? |
| THE WITNESS: | Offered – I mean – – |
| MR. PRICE: | You would not be testifying here today had you not been granted immunity, isn't that correct? |
| THE WITNESS: | Well, I don't know.  I come in and I took the Fifth and he said that I had to testify. |
| MR. PRICE: | You had to testify?  And you were granted immunity from that? |
| [THE WITNESS:] | Yes. |
| [MR. PRICE:] | Okay.  Did your attorney explain to you that that means you can't be prosecuted? |
| [THE WITNESS:] | For this, yes. |
| [MR. PRICE:] | That's correct.  So you were granted immunity so you can testify to that, is that correct? |
| [THE WITNESS:] | I guess, yes. |

(Id. at 58-59).

After an afternoon recess, the prosecution called Kasey Thacker's mother, Cindy Thacker.  (Id. at 73).  Ms. Thacker testified that Stonebreaker called her the night before the robbery and asked to borrow the white Dodge Spirit the next morning to go to Fairmont. (Id. at 76-77).  Ms. Thacker denied that she knew her vehicle would be used in the robbery.

According to Ms. Thacker, Stonebreaker had returned the vehicle by 4:30 p.m. on the day

of the robbery.  (Id. at 78).  On cross-examination, Ms. Thacker testified that she owned a

Preston Avenue residence where the petitioner and Stonebreaker once moved before

moving to another neighborhood.  Two young boys, the Auvil brothers, who were friends

of her daughter, rented the Preston Avenue residence at the time of the robbery.  (Id. at

80).

Next, the prosecution called the lead investigating officer, Detective Robert G.

Matheny.  (Id. at 83).  Detective Matheny testified that the petitioner called him at 5:03 p.m.

on the day of the robbery, Matheny asked if he was in the blue Ford Explorer, and the

petitioner denied that he was and hung up.  (Id. at 94).  Detective Matheny further testified

that he was able to obtain surveillance video from Walmart which recorded the events in

the parking lot.  Detective Matheny then described what the video depicted:

> The tape depicts the blue SUV pull into a parking spot towards the front of
> one (1) of the rows at Wal-Mart.  It also depicts two (2) people walking
> towards Wal-Mart, who are later identified to be James Talerico and Kay
> Knots.  It then indicates the driver of the SUV let somebody out of the back.
> The subject ran out of view of the camera towards the grocery side of the
> Wal-Mart.  Seconds later, ran back and jumped into the vehicle on the
> passenger side.

(Id. at 95-96).

After a bench conference, and without playing the video, the court excused the jury

to discuss with counsel the need of a Walmart employee to authenticate the video.  (Id. at

96-98).  During this discussion, the prosecution admitted that there was nothing in the video

from which a jury could make an identification of the assailant.  (Id. at 99). Eventually, the

court tentatively sustained an objection to the video's authentication without foundation testimony from a Walmart employee.  (Id. at 100).   Upon the jury's return, Detective Matheny testified that he could not make an identification from his review of the videotape. (Id. at 102-03).   On cross-examination, Detective Matheny testified that none of the petitioner's fingerprints were found on the Explorer, and that neither the money nor the box was ever recovered.  (Id. at 108).  Detective Matheny also agreed that a search warrant was never executed to search the residence where the petitioner and Stonebreaker lived. (Id. at 110).  The court then excused the jury for the evening.  (Id. at 114).

Subsequent to the jury being excused, the court asked defense counsel upon what argument he planed to base a motion for judgment of acquittal.  Defense counsel indicated that he would rely upon two bases: (1) the only inculpatory evidence admitted was Thacker's testimony and (2) the evidence admitted fails to prove that the victims were placed in fear of intimidation.  (Id. at 118-24).  The Court responded as follows:

> THE COURT:      . . . Take that fear issue out of there, then certainly – I mean, the jury may not believe [Thacker's] testimony. But if they do believe it, it's sufficient for a conviction if [the prosecution] put[s] something in to determine what weight and credit to give it.  But I think there's enough there to let the jury consider it.  And if they do believe it, [then] they could find beyond a reasonable doubt that the defendant's guilty of this offense, assuming the fear issue's resolved.

(Id. at 124-25).  After conducting a charge conference, the court dismissed counsel until the next morning.  (Id. at 130-33).

On the second day of trial, November 20, 2002, the prosecution indicated it would rest after recalling Detective Matheny to provide a foundation to admit the Walmart video,

8

with no objection by defense counsel to authentication without testimony from a Walmart employee.  (Id. at 133).  For logistical purposes, the court asked defense counsel to make his motion for judgment of acquittal.  (Id. at 134).  Defense counsel then argued that acquittal was warranted because the testimony of Knotts was inadequate to establish the element of fear; the court found the testimony sufficient to deny the motion subject to renewal at the end of all the evidence.  (Id. at 134-38).  The prosecution then recalled Detective Matheny, moved the video for admission into evidence, and published the video to the jury.  (Id. at 139-42).  On cross-examination, Detective Matheny again admitted he could not identify the petitioner as the assailant who grabbed the box of money.  (Id. at 143).  The prosecution rested.  (Id. at 145).

Defense counsel presented a theory with two components: (1) the petitioner had an alibi and (2) the man who grabbed the box was a tenant at one of Cindy Thacker's properties.  With regard to the petitioner's alibi, defense counsel elicited testimony from a Salem BP Station cashier who stated that she remembered a man asking for a pen and paper at approximately 2:45 p.m., on the day of the robbery.  The cashier also testified that the BP Station is located at least twenty (20) minutes from the Eastpointe Plaza Walmart.  (See Id. at 145-54).  In further support of this alibi, defense counsel called a BP Station customer who testified that he remembers a man asking for pen and paper that day and identified him as the petitioner.  The customer also testified that the BP Station is at least fifteen (15) minutes from the Walmart.  (See Id. at 155-63).

The defense also called Stonebreaker who testified that she and the petitioner were at home all day except for a trip to the BP Station to purchase cigarettes.  The purchase

9

was never made, Stonebreaker testified, because the petitioner had forgotten his money in another pair of pants. (See Id. at 206-34). The petitioner also took the stand in his own defense. He testified consistently with being at home all day except for the trip to the BP Station for cigarettes which he failed to bring money to purchase. The petitioner further testified that what he had written on the sheet of paper was the phone number of a customer at the BP Station who was talking to another customer about a motorcycle for sale. (See Id. at 235-53). A neighbor corroborated that the petitioner and Stonebreaker had been home all day, testifying that she saw the petitioner at 1:00 p.m. and Stonebreaker between 2:30 and 3:00 p.m. (See Id. at 164-73).

In support of their theory that the assailant was another man, the defense called Sheila Brewer, who lived across from the two boys at Cindy Thacker's Preston Avenue residence. (Id. at 174-75). Brewer testified that between 7:00 and 7:30 a.m., on the day of the robbery, she saw Kasey Thacker drive up to the Auvil brothers' residence in a blue Ford Explorer and honk the horn. One of the brothers came out, talked to Thacker at the driver's side window, and re-entered the home. The boy then returned and entered the vehicle with Thacker and left. (Id. at 176). Later that afternoon, Brewer saw the brothers and another male acting suspicious on the brothers' porch. While the brothers watched down the street, the third subject backed up, tossed in through the front door what appeared to be a black toboggan, and then watched down the street. (Id. at 177). Brewer described this activity as suspicious because she had just heard a report on her scanner about a blue Ford Explorer registered to Cindy Thacker being used in a robbery. (Id. at 178). Finally, Brewer testified that about 10:00 p.m. that evening a small white vehicle

stopped at the Auvil brothers' residence.  The brothers came out of the house and placed what appeared to be a cooler that could hold a six-pack in the trunk of the white vehicle. (Id. at 178-79).

On cross-examination, Brewer conceded that she often listened to her scanner and frequently provided tips to law enforcement.  (Id. at 181).  Brewer also admitted that she was a bail bondsman and had signed a form to post over $16,000 of the petitioner's bond for the Second Degree Robbery charge.  (Id. at 187-88).

With this evidence, the court read the jury instructions, counsel presented closing arguments,  and the jury was excused to commence deliberations.  ([Doc. 15-2] at 4).  On November 21, 2002, the jury returned with a verdict finding the petitioner guilty of Second Degree Robbery.  (Id.).

On December 3, 2002, counsel for the State filed a Recidivist Information [Doc. 15-3] pursuant to West Virginia Code § 61-11-18.  The trial court set the matter for a December 13, 2002, hearing.  After several continuances, consideration and denial of numerous post-trial motions, and change of counsel, the petitioner recidivist hearing commenced on April 25, 2003.  A petit jury found that the petitioner was the same person who had been convicted of Nighttime Burglary in 1991 and Possession of a Controlled Substance with Intent to Deliver in 1998 [Doc. 15-4].  By Order dated May 21, 2003, the trial court sentenced the petitioner to life with mercy on the Second Degree Robbery Charge [Doc. 15-5].[1]

---

[1]The petitioner was also convicted of Breaking and Entering in Case No. 02-F-185 and sentenced to 1 to 10 years for that conviction.  ([Doc. 15-5] at 4).

By counsel, Thomas G. Dyer, the petitioner appealed his conviction and sentence to the Supreme Court of Appeals of West Virginia, claiming the following ground for relief:

> The Circuit Court of Harrison County, West Virginia erred in denying the Defendant's motion for Judgment of Acquittal because the State did not prove beyond a reasonable doubt that James Michael Talerico was intimidated or fearful which is a required element in a conviction for Second Degree Robbery.

([Doc. 15-6] at 10).  The Supreme Court of Appeals summarily refused the appeal by entered March 10, 2004 [Doc. 15-6].

B.    Collateral Attack in State Court

On August 4, 2004, the petitioner, proceeding *pro se*, filed a petition for post-conviction relief in the Circuit Court of Harrison County pursuant to West Virginia Code § 53-4A-1, *et seq.* (Case No. 04-C-371-1) [Doc. 15-7].  After an initial review of the petition, the state habeas court appointed Thomas G. Dyer as the petitioner's habeas counsel.  On December 23, 2004, Dyer submitted an amended petition [Doc. 15-8], and on July 16, 2007, the petitioner's second habeas counsel, Stephen S. Fitz, filed a Second Supplemental Petition/Memorandum for Post-Conviction Habeas Corpus Relief [Doc. 15-9]. Among the grounds for relief was that "[t]he State failed to produce two key pieces of evidence despite defense counsel's motion (1) . . . the surveillance video from the Go-Mart . . . and (2) key exculpatory information regarding a plea offer to [Kasey Thacker] two weeks before the defendant's trial."  (Id. at 8).  After two omnibus hearings held July 16, 2007 [Doc. 15-11] and December 17, 2007 [Doc. 15-12], the state habeas court denied the petition by Order entered June 2, 2009 [Doc. 15-13].

12

The petitioner, represented by Fitz, appealed the denial of his state habeas petition on November 20, 2009, stating as one of the grounds that "[t]he Prosecution suppressed favorable material evidence that violated Petitioner's due process and 14th Amendment rights when it failed to disclose a pre-trial agreement with [Kasey] Thacker, the co-defendant, that if she testified and talked with the State before the trial of petitioner, the State would, in return, request immunity on her behalf." ([Doc. 15-14] at 5).  On March 4, 2010, the Supreme Court of Appeals summarily denied the petition.  (Id. at 2).

C.    Collateral Attack in Federal Court

On April 9, 2010, the *pro se* petitioner filed a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "§ 2254 Petition") [Doc. 1].  The Petition claims the following three (3) grounds for relief:

[1.]  The Prosecution suppressed/withheld favorable material evidence that violated Petitioner's constitutional rights when it failed to disclose a pre-trial agreement with Ms. Kasey Thacker, an alleged co-defendant, that if she testified and talked with the State before the trial of Petitioner, the State would, in return, request immunity on her behalf.

[2.]  Petitioner's trial counsel was ineffective when he failed to personally ascertain the whereabouts and contents of the Go-Mart security video that was used as a basis for testimony in the Grand Jury proceedings resulting in his client's indictment.

[3.]  The Prosecutor's failure to disclose the agreement of immunity thereby gaining a tactical advantage in eliciting Ms. Thacker's testimony and an advantage in the prosecutor's summation by bolstering Ms. Thacker's credibility, amounted to prosecutorial misconduct and thereby denying the Petitioner the right to a fair trial and warranting a new trial.

(See [Doc. 1] at 5-15).

13

On May 23, 2010, Magistrate Judge Seibert ordered the respondent, Warden Adrian Hoke, to show cause why the petition should not be granted [Doc. 12].  On June 14, 2010, the respondent filed his Response [Doc. 14] together with a Motion for Summary Judgment [Doc. 15] and a Memorandum in Support [Doc. 16].  Responding to a **Roseboro** Notice [Doc. 17], the petitioner filed a Consolidated Response and Memorandum of Law in Support of Petitioner's Motion in Opposition to the Respondent's Motion for Summary Judgment [Doc. 25] on September 7, 2010.

On November 19, 2010, Magistrate Judge Seibert entered the instant R&R, recommending that the respondent's motion be granted and the § 2254 Petition be dismissed with prejudice.  ([Doc. 28] at 30).  The petitioner filed timely Objections [Doc. 33] on December 20, 2010.

IV.    Discussion

In his Objections, the petitioner takes issue with the recommendation of the magistrate judge.  The Court will address these objections as they relate to each of the petitioner's three grounds discussed above.

A.    **Ineffective Assistance of Trial Counsel**

The petitioner claims his trial counsel was constitutionally ineffective because he failed to obtain a copy of a surveillance video from Go-Mart, where Thacker testifies Stonebreaker waited for Knotts and Talerico to exit the Bob Evans.  The petitioner argues that he was prejudiced by this error because the surveillance tape fails to corroborate Thacker's testimony.   For the reasons stated below, this Court finds that trial counsel's failure to obtain a copy of the video was not ineffective assistance.

14

In reviewing Sixth Amendment claims based on ineffective assistance of counsel, counsel is presumed to have rendered effective assistance.  The burden is on the petitioner to establish ineffective assistance.  *See* ***Strickland v. Washington***, 466 U.S. 668, 689 (1984).  The Court in ***Strickland*** articulated a two-prong analysis to determine whether counsel has rendered ineffective assistance.  First, a petitioner must show that his counsel's performance fell below an objective standard of reasonableness.  ***Id.*** at 688.  Second, a petitioner must demonstrate that he was prejudiced by counsel's performance.  To demonstrate prejudice, "the defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine the confidence in the outcome."  ***Id.*** at 694.  If the defendant fails to demonstrate prejudice, courts need not address counsel's performance.  *See* ***Fields v. Atty. Gen. of Md.***, 956 F.2d 1290, 1297 (4th Cir. 1992).

In the instant case, the record shows that the zip drive copy of the Go-Mart video was blank when turned over to defense counsel.  ([Doc. 15-10] at 46; [Doc. 15-12] at 44-45).  The record also indicates that defense counsel made several efforts to obtain a readable copy of the video.  First, defense counsel moved to compel the production of the Go-Mart video; however, at the hearing, counsel for the State stated that he had turned everything over.  ([Doc. 15-13] at 38).  In fact, at no time did the State also have a copy of the Go-Mart video.  ([Doc. 15-12] at 82).  Instead, Detective Matheny viewed the video from the computer at Go-Mart and attempted to copy the video to a zip drive, to no avail.  (Id. at 81-82).  Second, defense counsel, his legal assistant, and Detective Matheny "spent

probably four hours over at [defense counsel's law office] with their computer guy trying to pull any images off of th[e] zip drive . . .." (Id. at 82).  According to defense counsel, given counsel for the State's representations and the condition of the tape, there was "nothing to follow-up on." (Id. at 31).  The evidence presented at trial did not include the Go-Mart video, nor did Detective Matheny testify as to his observation of the video at Go-Mart. (Id.).

Upon careful consideration of the record, this Court finds that defense counsel's failure to obtain a readable copy of the Go-Mart video was not ineffective assistance. Defense counsel enlisted his firm's IT specialist who was unable, after four hours, to retrieve any readable video from the zip drive copy produced by the State.  Once defense counsel discovered that the zip drive copy was blank, he moved to compel production of a readable copy.  Defense counsel then understandably relied upon the representations of the State that all evidence had been turned over, and that it too had a blank copy of the zip drive.  As such, this Court finds that the petitioner has failed to demonstrate that counsel's performance was objectively unreasonable.  Accordingly, on this ground, the Court hereby **OVERRULES** the petitioner's objection and **ADOPTS** the magistrate judge's R&R.

### B.    *Brady* Violation

Next, the petitioner claims that the State violated his due process rights under the 14th Amendment, as articulated in ***Brady v. Maryland***, 373 U.S. 83 (1963), by failing to disclose a pre-trial immunity agreement with Kasey Thacker.  This violation was material, the petitioner argues, because defense counsel was prevented from effectively cross-examining Thacker and the jury was prevented from hearing all necessary facts.  For the

reasons outlined below, this Court finds that the petitioner has demonstrated that this failure to disclose constituted a material ***Brady*** violation.

The ***Brady*** doctrine "requires a court to vacate a conviction and order a new trial if it finds that the prosecution suppressed materially exculpatory evidence.  To secure relief under ***Brady***, a defendant must: (1) identify the existence of evidence favorable to the accused; (2) show that the government suppressed the evidence; and (3) demonstrate that the suppression was material."  ***United States v. King***, 2011 U.S. App. LEXIS 474, *17 (4th Cir. Jan. 10, 2011) (citing ***Monroe v. Angelone***, 323 F.3d 286, 299 (4th Cir. 2003)).

### 1.      Existence of ***Brady*** Evidence

To constitute ***Brady*** evidence, "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching . . .."  ***Strickler v. Greene***, 527 U.S. 263, 281-82 (1999).  This exculpatory or impeachment evidence "is not limited to formal plea bargains, or other notarized commitments.  It applies to 'less formal, unwritten, or tacit agreement[s]' so long as the prosecution offers the witness a benefit in exchange for his cooperation . . .."  ***Harris v. Lafler***, 553 F.3d 1028, 1035 (6th Cir. 2009) (quoting ***Bell v. Bell***, 512 F.3d 223, 233 (6th Cir. 2008) (en banc)).

Here, the petitioner claims that the prosecution had a tacit pre-trial immunity agreement with Kasey Thacker, evidence that would have been favorable for its impeachment value.  Upon a review of the record, this Court agrees and finds that this agreement constitutes ***Brady*** evidence.

In its supplemental discovery responses on October 4, 2002, the State provided the

17

following:

> Kasey Thacker was offered, in exchange for her cooperation with the State in the prosecution of the defendant in this matter, a plea by information to the charge of Accessory After the Fact, a violation of W.Va. Code 61-11-6, with an agreement of a one year sentence suspended, two years probation, and a dismissal of the felony charge.

([Doc. 15-19] at 3).  Thacker rejected the offer of the State, which then subpoenaed Thacker to testify at the petitioner's trial.  When called to testify, however, she invoked her Fifth Amendment right against self-incrimination.  The trial court ordered her testify and granted her immunity, apparently at the request of the State.  ([Doc. 15-15] at 58).

In a deposition taken during the petitioner's state habeas proceedings, Prosecutor Hall testified that he had informed Thacker's counsel before trial that he intended to call Thacker as a witness, and if she invoked her Fifth Amendment right against self-incrimination, he intended to ask the Court to grant her immunity:

Q.   So it was kind of orchestrated ahead of time –

A.   We knew how procedurally it was going to go.  We didn't know whether the judge would go along with it or not.  But I had told her that I'm going to call her as a witness and she said I'm going to plead the fifth, her attorney did, and I said, well, you know, if you do that, then I have to have you.

([Doc. 15-10] at 97).

Prosecutor Hall was then asked to elaborate on his pretrial interaction with Thacker's counsel:

Q.   You used the term immunity agreement.  Was there eventually an agreement between you and Kasey about immunity or was – the way

18

I understand it you said [Thacker's counsel] said if you call her up, she's going to take the fifth.  And you said, oh, if she does, that, I'm going to –

A.      I think that's the way it went.  I don't think there was any paperwork signed.  Basically, like I said, I tried to get her to plead, she wouldn't do it and I told – you know.

I don't even know if I had her subpoenaed yet or not, but I told her to turn in her caller.  She says, "I'm going to tell her to plead the fifth." And I said, Well, then I don't have no choice but to do this."

We kind of knew that's the way it was going to proceed.

(Id. at 113).

Finally, Prosecutor Hall was asked to describe the events which led to Thacker testifying at trial:

Q.      Is that how it happened at trial?

A.      Yeah, and that's how it happened at trial.  I mean, like I say, it was kind – I guess you can say it was kind of orchestrated because we all knew what steps we were going to go.  We didn't know what the judge was going to do.

But, you know, before that I said, "Well, I want to hear what she has to say before I decided that."  And we had a meeting and I told her that, you know, that I will ask for immunity as long as you tell the truth. There was some discussion, "Am I going to get in trouble?" I said not if you tell the truth.  That's pretty much it.

Q.      So there was that part in terms –

A.      Right.

Q.      – you met with her and said you would go through with this process

19

of asking for immunity if she gave you her testimony beforehand?

A.  Right.

(Id. at 114).

At a state habeas hearing on April 20, 2007, Prosecutor Hall produced an unsigned letter, dated November 7, 2002, and addressed to Thacker's counsel.  The letter appears to summarize a previous conversation between the two and outlines a plea offer for Ms. Thacker:

> In exchange for the State dismissing the Felony charge against your client with prejudice, and requesting immunity for your client in these matters, the State would require your client to cooperate in the prosecution of Clifford Merrit [sic] and Belinda by [inter alia]:
>
> Testifying truthfully in the matters both against Mr. Meritt and Belinda Stonebreaker.

([Doc. 15-9] at 65).

In addition to the letter, Prosecutor Hall produced an unsigned proposed order dismissing Thacker's indictment based upon the following events.   Thacker was subpoenaed on November 19, 2002, to testify in the petitioner's Second Degree Robbery case. Thacker invoked her Fifth Amendment privilege against self-incrimination. The State proffered that it would be in the interest of justice to order the defendant to testify.  After hearing arguments of counsel, the court ordered Thacker to testify and granted her immunity from prosecution.  Thacker testified and offered self-incriminating testimony.  (Id. at 67).

Based upon the foregoing, this Court concludes that the State had formed a tacit

20

agreement with Thacker and/or Thacker's counsel, whereby the State would request immunity on her behalf if the court were to order her to provide self-incriminating testimony. Because this agreement would have been favorable to the defense for its impeachment value, the agreement constitutes **_Brady_** evidence.

### 2.    Suppression of _Brady_ Evidence

Suppression under **_Brady_** can be either a willful or inadvertent failure to disclose favorable evidence.  **_Strickler_**, 527 U.S. at 281-82.  The State argues that it did not suppress its agreement with Thacker insofar as Prosecutor Hall informed the petitioner's counsel on the day of trial that he intended to request immunity for Thacker if she invoked her Fifth Amendment right against self-incrimination.  The Court finds this argument unavailing.

Even if Prosecutor Hall informed defense counsel of his intention to request immunity for Thacker if the court ordered her to testify, the record is absent of any indication that defense counsel was aware of the pre-trial discussions between Prosecutor Hall and Thacker's counsel.  In fact, defense counsel testified to this unawareness at the December 17, 2007, omnibus hearing:

> Q.    Okay.  What I'm getting at is, you didn't know, though, beforehand that the State and [Thacker's counsel] were actually talking about dismissing her case and request the Court – immunity; is that correct?
>
> A.    Yes, sir.  I had no knowledge of prior discussions between Hall and [Thacker's counsel].

([Doc. 15-12] at 48).

Based upon the foregoing, this Court concludes that the State's failure to disclose the full extent of its pre-trial discussions with Thacker and/or Thacker's counsel was, at the very least, inadvertent.  Accordingly, that failure to disclose constituted suppression under *Brady*.

### 3.   Materiality of Suppression

To prove materiality under *Brady*, a defendant must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have different."  *King*, at *19 (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (internal quotation omitted)).   "[A] showing of materiality does not require demonstration . . . that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." *Kyles*, 514 U.S. at 506 (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Instead, "materiality is a 'reasonable probability' of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678.  For the reasons outlined below, this Court finds that the State's failure to disclose the full extent of its pretrial immunity discussions with Thacker and/or Thacker's counsel undermines confidence in the outcome of the petitioner's trial.

22

First, there is an undeniable difference between the way a juror perceives the credibility of a witness ordered to testify against her will versus a witness merely following a pre-orchestrated plan between the State and her counsel.  Under the former scenario, it would not be unreasonable for a juror to attribute *more* credibility to a witness forced to testify against her will.  In fact, it would only be human nature for a juror to expect truthful testimony from an unwilling witness.  Under the second scenario, however, there is a reasonable probability that a juror would allow the involvement of the State, including its request for immunity, to cast at least some shadow of doubt on the witness' motivation to testify consistent with the State's theory of the case.

Second, Thacker's testimony was the only evidence presented at trial that was particularly incriminating to the petitioner.  Talerico, from whom the assailant grabbed the money box, did not testify at trial.  Knotts, the assistant manager escorted by Talerico to make the deposit, testified that she was unable to identify the assailant.  Beto, the local newspaper reporter who witnessed the assailants removing their disguises, testified that she was unable to provide any positive identification of the passenger in the blue Ford Explorer.  Detective Matheny, the leading investigator, testified that law enforcement was unable to identify the perpetrators depicted on Walmart's parking lot surveillance video. The now infamous Go-Mart video was not presented or even referenced at trial.  No physical evidence was produced to incriminate the petitioner.  None of his fingerprints were discovered.  None of the disguises or even the money was recovered.  Indeed, as

Prosecutor Hall admitted in his closing argument[2], "except for Kasey Thacker's testimony, this case might be over."  ([Doc. 25-1] at 4).

Finally, in his rebuttal argument, Prosecutor Hall compounded his ***Brady*** violation and thereby further undermined this Court's confidence in the trial's outcome.  Defense counsel argued that Thacker "took the Fifth Amendment – and . . . received immunity from [the] prosecution in exchange for her testimony here."  In his rebuttal, Prosecutor Hall stated:

> They keep wanting to tell you that she got beat.  Well, she was ordered to testify.  She took the stand and she said, "I refuse."  And the Judge said, "I order you to testify."

([Doc. 25-1] at 17).  Viewed in the context counsel's exchange in closing arguments, this Court interprets the phrase "she got beat" to mean "she got a deal."  Thus, in response to defense counsel's accusation that Thacker received an immunity deal from the State, Prosecutor Hall argues, in effect, that the State had nothing to do with the deal.  Instead, immunity came solely from the trial court.  In light of the tacit agreement between the State and Thacker's counsel, Prosecutor Hall's argument is misleading, at best, and untrue, at worst.  That the jury may have been misled by this argument contributes to undermining this Court's confidence in the trial's outcome.

Based upon the foregoing, this Court concludes that the State's ***Brady*** violation

---

[2]In responding to the Warden Hoke's Motion for Summary Judgment, the petitioner attached what purports to be a transcript of counsel's closing arguments.  This Court recognizes that the transcript may not be official; however, insofar as the respondent has neither challenged the transcript's authenticity nor denied its accuracy, the Court will consider the transcript as part of the record.

undermines the confidence in the outcome of the petitioner's trial, and therefore, is material.   As such, the petitioner's conviction and sentence should be **VACATED**. Accordingly, on this ground, the Court hereby **SUSTAINS** the petitioner's objection and **REJECTS** the magistrate judge's R&R.

### C.    *Giglio* **Violation**

Finally, the petitioner claims that Prosecutor Hall and Detective Matheny engaged in misconduct by vouching for and bolstering the credibility of Kasey Thacker.    In his Objections, the petitioner apparently takes issue only with Prosecutor Hall's failure to correct allegedly false testimony elicited from Thacker on cross-examination.[3]  The Court construes this claim as one pursuant to the doctrine in *Giglio v. United States*, 405 U.S. 150 (1972), which recognized that a prosecutor violates an accused's Fifth Amendment right to due process if he knowingly allows the factfinder to be misled by false evidence from a prosecution witness.

On defense counsel's cross-examination of Thacker, the following exchange occurred:

| | |
|---|---|
| [MR. PRICE:] | Okay.  And it's correct that you were offered immunity from prosecution in exchange for your testimony here today, is that correct? |
| THE WITNESS: | Offered – I mean – |
| MR. PRICE: | You would not be testifying here today had you not been |

---

[3]As such, this Court has reviewed the magistrate judge's conclusions regarding the petitioner's challenges to other statements and finds no clear error.  Accordingly, to that extent, this Court **ADOPTS** the magistrate judge's R&R.

| | granted immunity, isn't that correct? |
|---|---|
| THE WITNESS: | Well, I don't know.  I come in and I took the Fifth and he said that I had to testify. |
| MR. PRICE: | You had to testify?  And you were granted immunity from that? |
| [THE WITNESS:] | Yes. |

([Doc. 15-15] at 58-59).

The petitioner argues that Prosecutor Hall's failure to correct this testimony by disclosing that there had been a tacit agreement between the State and Thacker's counsel to attain immunity constitutes a *Giglio* violation.  This Court disagrees.

First, Thacker was not "offered" immunity in exchange for her testimony, even considering the tacit agreement between the State and Thacker's counsel.  Instead, the State offered to *request* immunity from the trial court.  Second, Thacker truthfully recounted that she asserted her Fifth Amendment right against self-incrimination and that the trial court ordered her to testify with immunity.  Thus, insofar as Thacker provided truthful testimony, Prosecutor Hall had no duty to correct her testimony.  As such, Prosecutor Hall committed no *Giglio* violation.  Accordingly, on this point, the Court hereby **OVERRULES** the petitioner's objection and **ADOPTS** the magistrate judge's R&R.

V.    Conclusion

Upon careful review of the R&R, it is the opinion of this Court that the magistrate judge's Report and Recommendation **[Doc. 28]** is hereby **ADOPTED IN PART** and **REJECTED IN PART**.  In this regard, the petitioner's Objections **[Doc. 33]** are **OVERRULED IN PART** and **SUSTAINED IN PART**.  As such, Respondent Warden Adrian

Hoke's Motion for Summary Judgment **[Doc. 15]** is hereby **GRANTED IN PART** and **DENIED IN PART**.  Finally, the petitioner's § 2254 Petition **[Doc. 1]** is hereby **GRANTED IN PART** and **DENIED IN PART**.  Accordingly, the petitioner's conviction and sentence in Case No. 02-F-186-1before the Circuit Court of Harrison County, West Virginia are hereby **VACATED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record and to mail a copy to the *pro se* plaintiff and the Circuit Court of Harrison County, West Virginia.

**DATED**: January 18, 2011.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE